IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN YOUNG, EZEKIEL YOUNG, ROBERT KENNEDY AND STEVEN JOHNSON, | |
| Plaintiffs | CIVIL ACTION No. 08-CV-4610 |
| vs. | |
| | HON. ANITA BRODY |
| ST. JAMES MANAGEMENT, LLC, STONEHENGE-WALNUT LLC and STONEHENGE ADVISORS, LLC, (d.b.a. STONEHENGE-WALNUT, LLC), | JURY TRIAL DEMANDED |
| Defendants. | |

SECOND AMENDED COMPLAINT

I. <u>PRELIMINARY STATEMENT</u>

This is an action for an award for damages, declaratory and injunctive relief, attorney's fees and other relief on behalf of Plaintiffs, Steven Young, Ezekiel Young, Robert Kennedy and Steven Johnson (hereinafter collectively referred to as "Plaintiffs"). Plaintiffs were employees of St. James Management, LLC, ("SJM), StoneHenge-Walnut LLC ("SHW"), and/or StoneHenge Advisors, LLC, all d.b.a. StoneHenge-Walnut, LLC ("SHA"), in Philadelphia, Pennsylvania, who has been harmed by violations of Title VII of the Civil Rights Acts of 1964 and 1991, 42 U.S.C. §1981, and the Pennsylvania Human Relations Act by Defendants and their agents, servants and representatives.

This action is brought under Title VII of the Civil Rights Acts of 1964 and 1991, 42 U.S.C. §1981, and the Pennsylvania Human Relations Act.

1

## II. JURISDICTION AND VENUE

1. The jurisdiction and venue of this Court is invoked in this District pursuant to 28 U.S.C. §1331 as arising under the laws of the United States, particularly the Title VII of the Civil Rights Acts of 1964 and 1991, and 42 U.S.C. §1981.

2. The Supplemental Jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. §1367, to consider Plaintiff's claim arising under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. § 951 *et seq.* and under Pennsylvania common law.

3. All conditions precedent to the institution of this suit has been fulfilled. As to the Title VII claims, Plaintiff has invoked the procedure set forth in Title VII and has received a Notice of Right to Sue as required by that statute. Plaintiffs each filed a Charge of Discrimination with the EEOC which was jointly filed with the Pennsylvania Human Relations Commission, against St. James Management, LLC, ("SJM), StoneHenge-Walnut LLC ("SHW"), and StoneHenge Advisors, LLC alleging, *inter alia* race based employment discrimination, and maintenance of a hostile work environment. The Equal Employment Opportunity Commission issued Notices of Right to Sue as to each Plaintiff on May 21, 2008.

4. This action was been filed within ninety (90) days of receipt of said Notice.

5. More than one year has elapsed since the filing of Plaintiffs' Complaint with the PHRC.

III. **PARTIES**

6. Plaintiff, Steven Young ("Mr. S. Young") is a former employee of Defendants, have been employed as a Maintenance Technician at Defendants' facility known as the St. James Hotel ("the St. James") in Philadelphia, Pennsylvania. Mr. S. Young is a citizen and resident of the State of Delaware, residing at 2309 Wilson Ave., Claymont, Delaware.

7. Plaintiff Ezekiel Young ("Mr. E. Young") is a former employee of Defendants, having been employed as a Doorman, a Maintenance Technician and in Defendants' Housekeeping Department. Mr. E. Young is a resident and citizen of the Commonwealth of Pennsylvania residing at 701 1 Limekiln Pike, Philadelphia, Pennsylvania.

8. Plaintiff Steven Johnson ("Mr. Johnson") is a current employee of Defendants, employed in the Housekeeping Department. Mr. Johnson is a resident and citizen of the Commonwealth of Pennsylvania residing at 5455 W Race St., Philadelphia, Pennsylvania.

9. Plaintiff Robert Kennedy ("Mr. Kennedy") is a former employee of Defendants, having been employed as a Painter. Mr. Kennedy is a resident and citizen of the Commonwealth of Pennsylvania residing at 1520 South 19th Street, Philadelphia, Pennsylvania.

10. Defendant St. James Management, LLC, ("SJM) is a Delaware Corporation with its principal place of business in the Commonwealth of Pennsylvania, at 200 West Washington Square, Philadelphia, Pennsylvania.

11. Defendant StoneHenge-Walnut LLC ("SHW") is a Pennsylvania Corporation with its principal place of business in the Commonwealth of Pennsylvania, at 200 West Washington Square, Philadelphia, Pennsylvania.

12. Defendant StoneHenge Advisors, LLC, d.b.a. StoneHenge-Walnut, LLC ("SHA") is a Delaware Corporation with its principal place of business in the Commonwealth of Pennsylvania, at 200 West Washington Square, Philadelphia, Pennsylvania.

IV.  STATEMENT OF THE CASE

   A. ALLEGATIONS OF PROTECTED CLASSIFICATION

13. Steven Young is an African American who began working for St. James on April 12, 2004 as a Maintenance Tech. Mr. St. Young was terminated from his employment on May 1, 2008.

14. Steven Johnson is an African-American who began working for St. James on August 19, 2004 in the Housekeeping Department and continues to work for St. James in that capacity.

15. Mr. E. Young is an African-American who was hired by St. James on October 18, 2004 as a doorman. On August 21, 2006, Mr. E. Young was promoted to the position of Maintenance Mechanic but was demoted to the Housekeeping Department.

16. Robert Kennedy is an African American who was hired by St. James on June 8, 2006 as a painter and terminated from his employment on in or about May 2007 for alleged selling a can of paint to a tenant.

4

## B. ALLEGATIONS OF DISPARATE TREATMENT

17. Plaintiffs were required to punch in and out on a machine that recorded the hours they were at present at work ("time card machine").

18. However, the Caucasian employees who worked at St. James were not required to punch in and out.

19. On or about April 27, 2007, Defendants alleged that Mr. E. Young violated a work rule regarding his "punching out" at the time card machine.

20. Mr. E. Young was given a written warning for this alleged violation.

21. Caucasian employees who failed to punch in or out were not disciplined for their failures in this regard.

22. Mr. E. Young filed a grievance over this discipline through his union, International Union of Operating Engineers Local 835, AFL-CIO ("union").

23. During the union grievance hearing Mr. E. Young presented his pay sheet which established that Mr. E. Young did not fail to punch out and in fact, worked overtime that same day. It also revealed that Alex Walker a Caucasian supervisory employee for Defendants, wrongfully changed Mr. E. Young's time sheet in an effort to issue the discipline to Mr. E. Young.

24. Upon information and belief, Defendants did not alter time sheets of Caucasian employees in an effort to discipline those Caucasian employees.

25. Pursuant to the agreement reached at the grievance hearing, the written warning was to be rescinded and removed from Mr. E. Young's personnel file. However, Mr. E. Young received no written verification that the warning was rescinded. Upon information and belief, there is no written

documentation of the rescission and the warning was not removed from Mr. E. Young's personnel file. Therefore, Mr. E. Young's personnel record continues to reflect that he was disciplined for this alleged infraction.

26. Mr. E. Young's job duties included checking on the building's heating and cooling system via a computer located in the HVAC room located in the building.

27. On May 9, 2007, Mr. E. Young was carrying out his duties and checking the cooling system on this computer.

28. While he was doing this, it was reported that he was playing solitaire on the computer. Pursuant to this report, Mr. E. Young was disciplined.

29. It would have been impossible for Mr. E. Young to be playing solitaire on this computer, because if he had been utilizing the computer for this purpose, the HVAC system in the building would have shut down.

30. Nevertheless, even if he had been playing solitaire, Defendants' discipline of him for this "offense" is discriminatory inasmuch as Caucasian employees regularly utilize Defendants' computers for non-business related activities including, but not limited to: shopping on the internet, viewing and editing personal photographs, playing computer games, making non-business travel and vacation arrangements, personal email correspondence and accessing the Internet for non-business related purposes.

31. Unlike Mr. E. Young, Defendants' Caucasian employees were not disciplined for such non-business related computer use.

32. In or about April or May 2007 there was an opening for the Chief Engineer

position at the St. James building.

33. In order to be responsible for the HVAC system at the St. James, one of the Chief Engineer's duties, one must possess a Class A Engineer's License or a Black Seal License.

34. Both Mr. S. Young and Mr. E. Young possessed all of the required experience, training, certifications, licensures and qualifications for the position and both applied for that position. Mr. S. Young possessed a Universal License from the Air Conditioning and Refrigeration Institute and a Black Seal License.

35. In fact, prior to applying for the position, Mr. S. Young was actually performing all of the duties and functioning as the Chief Engineer in the absence of a Chief Engineer - although he was not receiving compensation for performing these duties.

36. A Caucasian, Paul Kuzan, ("Mr. Kuzan"), who was not a current employee of Defendants also applied for the position.

37. Mr. Kuzan did not have the requisite training, certifications, licensures and qualifications for the position. Mr. Kuzan had only a refrigeration license. His possession of such license if hired as a maintenance worker would entitle him to $1 .OO per hour more than a maintenance worker without a refrigeration license.

38. Despite S. Young and E. Young's superior qualifications for the position and despite the fact that they were current employees of Defendants, Defendants hired Mr. Kuzan to become the Chief Engineer. In this

position, Mr. Kuzan was paid $27,000 per year more than Messrs. Young, who remained employed as maintenance workers.

39. Defendants attempted to justify the hiring of Mr. Kuzan over Messers. Young and Young by citing to training programs completed by Mr. Kuzan. However, the cited training programs were not required for the position.

40. Upon being named Chief Engineer, Defendants required Mr. S. Young to train his new supervisor, Mr. Kuzan, on the building's facilities because Mr. Kuzan was not familiar with them.

41. Shortly after Alex Walker ("Mr. Walker") was named Property Manager for the St. James, the restroom on the first floor of the building, the only restroom on that floor, was outfitted with a locking door.

42. Mr. Walker gave keys to Caucasian employees but did not provide keys to Plaintiffs or any other African-American employees. The Caucasian employees were permitted to use this restroom. Furthermore, Mr. Walker instructed the Caucasian employees to keep this bathroom locked so that it would "stay clean."

43. Plaintiffs were specifically forbidden to use this restroom.

44. Plaintiffs were, however, required to clean this restroom.

45. Shortly after Mr. Walker became Property Manager, Defendants took away parking spots from six African American employees, including Plaintiff's.

46. However, three Caucasian employees retained their parking spaces and additional parking spaces were issued to other Caucasian employees,

including those taken away from the African American employees.

47. After having their parking spaces taken away, Plaintiffs were required to pay for parking every day and walk a significant distance from off-site parking garages to get to work every day.

48. Defendants have bottled water shipped to it on a regular basis.

49. This water is consumed by the Caucasian employees.

50. Plaintiffs were forbidden from drinking this bottled water and were instructed by Mr. Walker that if they did drink this water, they would be terminated.

51. Defendants also put a lock on the refrigerator in order to block access to the water from Plaintiffs.

52. Keys to the refrigerator lock were provided to the Caucasian employees.

53. Caucasian employees were even permitted to provide the bottled water to their pets that they occasionally brought to work without discipline.

54. There was also a drinking water fountain at the St. James.

55. Plaintiffs were also prohibited from using the drinking water fountain, while Caucasian employees were permitted to use it.

56. Plaintiffs had no access to drinking water at the St. James, and if they became thirsty at work, they either had to drink water that they brought from home, or walk across the street and purchase a bottle of water from a convenience store.

57. In addition to being an employee of Defendants, Mr. S. Young was also a resident of the St. James pursuant to the terms and conditions of his

employment.

58. In December 2006, Mr. S. Young's son moved in with Mr. S. Young.

59. Shortly thereafter, his son's girlfriend, who is Caucasian, began to visit Mr. S. Young's son at their residence at the St. James.

60. On or about January 18, 2007, Mr. Walker approached Mr. S. Young and began speaking to him about his son and his son's girlfriend. Mr. Walker stated that he had seen the two together in the lobby and "it didn't look right - your son and his girlfriend holding hands walking through the lobby."

61. 58. Mr. S. Young asked, "What do you mean?" Mr. Walker replied, "You know what I mean."

62. Mr. Walker meant that it did not look good for an African American male to be holding a Caucasian female's hand while in the lobby of the St. James.

63. On or about January 29, 2007, Alan Casanoff, former owner and now consultant for SHA ("Mr. Casanoff'), approached Mr. S. Young and asked him if he had spoken to Mr. Walker about his son and his son's girlfriend. Mr. S. Young asked, "Is there a problem with my son and his girlfriend?" Mr. Casanoff answered, "Think about it. It doesn't look right."

64. On February 1, 2007, Mr. S. Young received a letter from Daniel Slobosky, President of SHA ("Mr. Slobosky"), advising him that his lease at the St. James was terminated, in violation of the terms of his employment.

65. On February 15, 2008, Mr. Slobosky spotted Mr. S. Young in the lobby at

the St. James, approached him and asked if he had ever met his son's girlfriend's parents. Mr. S. Young asked, "What difference does that make." Mr. Slobosky answered, "You know what I mean. If your son ever got into an argument and the police were called, they would take her side."

66. On May 1, 2008, Mr. S. Young received a letter of termination of his employment. The stated reason was for not moving out of his apartment. The same day, Defendants' attorney filed a complaint for non-payment of rent.

67. However, pursuant to Mr. S. Young's lease, no rent payment was required because his rent was included as part of his salary.

68. The stated reasons for termination and for eviction of Mr. S. Young are pretext for the actual reasons of racism and because Mr. S. Young's son was dating a Caucasian.

69. Mr. Kennedy performed all of the in-house painting at the St. James during the time period that he was employed.

70. Up until May 21, 2007, Mr. Kennedy had absolutely no disciplinary actions taken against him.

71. On that date, a tenant's father emailed Mr. Walker and reported that Mr. Kennedy sold his daughter (the tenant) a five gallon can of paint for $40.00.

72. Mr. Kennedy did not sell the tenant paint, nor upon information and belief, did the tenant ever so allege.

73. Mr. Kennedy was terminated for this violation without being given an

opportunity to rebut the charges.

74. Shortly after his termination, Mr. Kennedy's position was filled with a Caucasian worker.

75. This Caucasian worker was hired at a higher salary than Mr. Kennedy was paid.

76. In or about December 2006, Defendants held a Christmas party for the employees who worked at the St. James.

77. When Plaintiffs arrived at the Christmas party, they discovered they were assigned to sit at a table off to the side and away from the Caucasian employees.

78. Caucasian employees routinely take breaks on the loading dock area at the St. James.

79. Plaintiffs however, were required to walk across the street to take their breaks.

80. Mr. Johnson, while not permitted to take a break on the loading dock is required to clean the loading dock, including the cigarette butts left there by the Caucasian employees while they take their breaks.

81. At all relevant times to this Complaint, Defendants supplied the Caucasian office workers with coffee, snacks and cocoa.

82. Plaintiffs were prohibiting from entering the office area to get coffee, snacks and cocoa.

83. On June 6, 2007, Mr. E. Young was working as a Maintenance Technician when he injured his back.

84. He was permitted to return to work but, due to his injury, his physician placed on restrictions.

85. Defendants would not return Mr. E. Young to work as a Maintenance Tech with restrictions, but instead placed him in the Housekeeping Department, and replaced him with a Caucasian male.

86. This placement into the Housekeeping Department was a demotion.

87. At the time, there were open and available positions that would not have been a demotion, and for which E. Young was qualified.

88. Mr. Johnson remains employed at the St. James in the Housekeeping Department.

89. Mr. Johnson is required to water the plants located in the St. James.

90. However, similarly-situated Caucasian employees in the Housekeeping Department are not required to perform this duty.

91. In addition, Mr. Johnson has been denied the ability to seek promotion because open positions are not posted, but instead are directly offered to the Caucasian employees.

92. In late 2006 or early 2007, Mr. E. Young unintentionally overheard a conversation between Mr. Slobosky and Mr. Casanoff.

93. During this conversation, they stated that if they could replace the African-American employees with Caucasian employees they could improve their profits by at least 10 - 15%. The context of the conversation was that there is a negative connotation associated with the presence of African American employees on the St. James property.

94. Upon information and belief, all the above actions were taken against Plaintiffs in an attempt to terminate, either voluntarily or otherwise, Plaintiffs' employment at the St. James, thereby enabling Defendants replace Plaintiffs with Caucasian workers and improve their profits.

95. As a result of Defendant's unlawful race discrimination, Plaintiffs have lost considerable pay; past, present and future and suffered extreme humiliation, mental anguish, emotional pain, and damage to their reputation, both personal and professional.

96. Plaintiffs believe, and therefore aver, that Defendants created and/or permitted an intolerable and hostile work environment designed to interfere with their employment.

97. Defendants were responsible and liable for the conduct of its agents, employees and representatives for subjecting Plaintiffs to a racially hostile employment and work environment and for failing to protect Plaintiff from unlawful discriminatory conduct at the hands of their agents, employees and representatives.

98. As a direct result of Defendants' conduct, Plaintiffs suffered and continue to suffer severe emotional, psychological and physical distress.

COUNT I
ALL PLAINTIFFS vs. DEFENDANTS
VIOLATION OF TITLE VII

99. Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 98.

100. Defendant intentionally and maliciously discriminated against Plaintiffs

on the basis of their race (African American) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 52000e(2)(a).

101.   Any attempt at justifying Defendants' actions through alleged business reasons are pretextual and an attempt to hide the real reason for Defendants' actions – racial discrimination.

102.   Alternatively, in the event that Defendants' proffered reasons are credited as legitimate non-discriminatory reason, then Defendants would not have taken the adverse employment actions alleged if the discriminatory motive had not been present.

## COUNT II
## ALL PLAINTIFFS vs. DEFENDANTS
## VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT

103.   Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 102.

104.   The unlawful actions of Defendants acting as aforesaid, constitutes a violation of Title 43 Pa. Stat. Ann. § 951 *et seq.* of the Pennsylvania Human Relations Act.  The said unlawful practices for which Defendants are liable to Plaintiffs' include, but are not limited to, fostering and perpetuating a hostile and offensive work environment, subjecting Plaintiffs' to more onerous working conditions and treating Plaintiffs in a disparate manner.

105.   As a direct result of the Defendants' willful and unlawful actions in treating Plaintiffs' in a discriminatory manner solely because of their race,

in violation of Title 43 Pa. Stat. Ann. § 951 *et seq.* of the Pennsylvania Human Relations Act, Plaintiffs have sustained severe emotional distress, loss of earnings, plus the failure of the aforementioned benefits, plus loss of future earning power, plus back pay, front pay and interest due thereon.

## COUNT III
## ALL PLAINTIFFS vs. DEFENDANTS
## <u>NEGLIGENT VIOLATION OF TITLE VII</u>

106. Paragraphs 1 through 105 inclusive, are incorporated by reference as if fully set forth at length herein.

107. Defendants negligently violated the provisions of Title VII in the following respects:

   a. Failure to implement and/or enforce an effective, well-known and uniformly enforced policy against race discrimination;

   b. Failure to impose any discipline upon their employees who had engaged in race discrimination;

   c. Failure to take reasonable actions to discover illegal discrimination by their employees;

   d. Failure to take reasonable actions to prevent illegal discrimination, including but not limited to race discrimination, from taking place; and

   e. Failure to take reasonable actions and steps to prevent illegal retaliation in response to complaints and reporting of race discrimination and other protected conduct, as set forth more particularly herein.

108. Defendants owed Plaintiffs a duty in all of the respects set forth, but failed to perform each of those duties as set forth above.

   **109.** As a direct, reasonable and foreseeable result of the negligence of Defendants, Plaintiffs suffered the injuries and damages set forth above.

## COUNT IV
## EZEKIEL YOUNG and STEVEN JOHNSON vs. DEFENDANTS
## VIOLATION OF 42 U.S.C. § 1981

110. Paragraphs 1 through 109 inclusive, are incorporated by reference as if fully set forth at length herein.

111. The actions set forth above were intended to, and had the effect of interfering with Plaintiff's performance, modification, and termination of their employment contract, actual and implied in law, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, because of their race, and in violation of 42 U.S.C. § 1981.

## STATEMENT OF FACTS JUSTIFYING
## THE IMPOSITION OF PUNITIVE DAMAGES

112. Paragraphs 1 through 111 inclusive, are incorporated by reference as if fully set forth at length herein.

113. At all times relevant hereto, Defendants knew or should have known of the pattern of conduct in which their agents, employees and representativies had engaged and in which they continued to engage.

114. At all times relevant hereto, Defendants knew or should have known that the aforesaid pattern of conduct was in violation of the law.

115. Despite such knowledge Defendants failed to adequately investigate, discipline or discharge its agents, servants and representatives who discriminated against and created a racially hostile work environment, and subjected them disparate treatment.

116. Defendants failed and refused to properly protect and support

Plaintiffs and in fact subject or permitted them to be subjected to further harassment and discrimination.

117. At all times relevant hereto, Defendants Lafayette acted willfully, wantonly, recklessly and with an outrageous disregard and indifference to the rights, safety and well being of the Plaintiffs and other employees similarly situated.

118. Because of the direct involvement of highly placed corporate officials, including but not limited to Slobosky, Casanoff and Walker in the pattern of discrimination, the corporate defendants are liable for punitive damages.

## V. PRAYER FOR RELIEF

119. Plaintiffs repeat the allegations of paragraphs 1 through 118 of this Complaint as if set forth at length herein.

WHEREFORE, Plaintiffs request this Court to enter judgment in their favor and against Defendants and request that this Court:

a. Exercise jurisdiction over their claims;

b. Award traditional tort remedies such as compensatory damages, pain and suffering, physical and emotional distress, economic loss, time loss, severe emotional trauma, including, but not limited to, and punitive damagesunder Title VII and § 1981;

c. Issue declaratory and injunctive relief declaring the above-described practices to be unlawful, and enjoining their past and continued effects;

d. Order Defendants to compensate Plaintiffs with a rate of pay and other benefits and emoluments to employment, to which they would have been entitled, had they not been subject to unlawful discrimination;

e. Order Defendants to compensate Plaintiffs with an award of front pay, if appropriate;

f. Order Defendants to compensate Plaintiffs for the wages and other benefits and emoluments of employment lost, because of their unlawful conduct;

g. Order Defendants to pay to Plaintiffs punitive damages under Title VII and §1981, and compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of employment of life and other nonpecuniary losses as allowable;

h. Order Defendants to pay to Plaintiffs pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

i. The Court award such other relief as is deemed just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury.

          HAHALIS & KOUNOUPIS, P.C.

          By:_____dd4739_____
             DAVID L. DERATZIAN, ESQUIRE
             20 East Broad Street
             Bethlehem, PA  18018
             (610) 865-2608
             Attorneys for Plaintiffs