## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN YOUNG and | : | |
| EZEKIEL YOUNG, | : | |
| Plaintiffs | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| | : | NO. 08-CV-4610 |
| ST. JAMES MANAGEMENT, LLC, | : | |
| STONEHENGE-WALNUT, LLC and | : | |
| STONEHENGE ADVISORS, LLC, | : | |
| (d.b.a. STONEHENGE-WALNUT, LLC), | : | |
| Defendants | : | |

October _29__, 2010                                              **Anita B. Brody, J.**

### MEMORANDUM

This case arises out of Steven Young and Ezekiel Young's allegations of race

discrimination against their former employer, Defendants St. James Management, LLC,

Stonehenge-Walnut, LLC, and Stonehenge Advisors, LLC ("Defendants").  In their Second

Amended Complaint, both Plaintiffs allege violations of Title VII (Counts I & III) and the

Pennsylvania Human Relations Act (Count II).  Ezekiel Young also alleges violations of 42

U.S.C. § 1981 (Count IV).  Defendants move for summary judgment on all four counts.[1]

---

[1] Jurisdiction over Counts I, III, and IV is proper pursuant to 28 U.S.C. § 1331.
Supplemental jurisdiction over Count II is authorized under 28 U.S.C. § 1367.

I. **Factual Background**[2]

    **A.  Facts Pertinent to Steven Young's Race Discrimination Claims**

    Plaintiff Steven Young ("Steve") is African American.  From April 12, 2004 through May 1, 2007, Steve was employed as a maintenance technician at the St. James, a luxury apartment building in Philadelphia, Pennsylvania.

    In addition to working at the St. James, Steve was also a resident of the building.  Steve had a twelve-month residential lease for a one-bedroom unit that began on May 1, 2004.  By its terms, the lease renewed automatically each year unless one party gave written notice at least sixty days before the end of the term.  One-bedroom units at the St. James can rent for up to $2,000 a month.  (Sablosky Dep. 55:8-9, Nov. 4, 2009.)  The Employment Addendum to Steve's Residential Lease Agreement waived rent in exchange for Steve waiving overtime compensation for on-call responsibilities.  Steve was the only employee provided with an on-site residence.  (Hughes Dep. 11:20, Jan. 21, 2010.)  The Employment Addendum also provided that Steve must vacate the unit within fourteen days if he resigned or was terminated.

    During his tenure at the St. James, Steve received numerous written warnings from Defendants for various infractions including: (1) overusing his company cell phone for personal calls; (2) refusing to move a second vehicle from the garage at the St. James; (3) behaving in a loud and abusive manner while on the premises; (4) spending time in his apartment during working hours; (5) intimidating and harassing a fellow employee; (6) refusing to abide by the

---

[2] For purposes of summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (internal citations and quotation marks omitted).  Here, the facts are stated in the light most favorable to Steven Young and Ezekiel Young, with all justifiable inferences drawn in their favor.

company dress code; (7) working overtime hours without authorization; and (8) refusing to perform assigned duties.

In December 2006, Steve's son moved in with him at the St. James. (Sec. Am. Compl. ¶ 58.) Steve's son is African American. (See id. ¶ 62.) Shortly after Steve's son moved in with him, his son's Caucasian girlfriend began to visit Steve's son at the St. James. (Id. ¶ 59.) On January 18, 2007, Alex Walker, Property Manager at the St. James, approached Steve to discuss Steve's son and his son's girlfriend. (Id. ¶ 60.) Walker told Steve that he had seen them holding hands in the lobby and that "it didn't look right." (Id.) When Steve asked Walker what he meant, Walker replied: "You know what I mean." (Id. at 61.) Steve believes Walker meant that it was inappropriate for an African American male to be seen holding a Caucasian female's hand at the St. James, where the majority of residents are Caucasian. (Id. ¶ 62.) On January 29, 2007, Alan Casnoff, former owner and current consultant of Defendant Stonehenge,[3] asked Steve if he had spoken to Walker about his son's girlfriend. (Id. ¶ 63.) When Steve asked if there was a problem, Casnoff replied: "Think about it. It doesn't look right." (Id.)

On February 1, 2007, Steve received a letter from Daniel Sablosky, President of Stonehenge, notifying him that his lease would be terminated at the end of the term. (Id. ¶ 64.) On February 15, 2007, Sablosky approached Steve and initiated a third conversation concerning Steve's son. (Id. ¶ 65.) Sablosky asked Steve if he had ever met his son's girlfriend's parents. (Id.) When Steve asked what difference it made, Sablosky responded: "You know what I mean."

---

[3] It is unclear what role Casnoff played in the St. James's personnel decisions in 2007. A jury could infer that he had influence at that time because evidence shows his recommendation was the basis for another personnel decision and that he was receiving notices of the warnings that Steve received. (Casnoff Dep. 8:25-9:20, Jan. 21, 2010.)

(<u>Id.</u>)  Sablosky went on to tell Steve that if his son and his son's girlfriend ever got into an

argument, the police would take the girlfriend's side.  (<u>Id.</u>)  Steve believes that Sablosky meant to

imply that the police would be less likely to believe his son because he was African American.

Steve failed to vacate his apartment by the end of the lease term.  On May 1, 2007, Steve

received a letter from Sablosky notifying him that he was being terminated from his employment

for "insubordination, including refusal to perform assigned duties or refusal to perform work in

the manner described by a supervisor or manager."  The letter also cited Steve's refusal to vacate

his apartment as a reason for termination.

On August 24, 2007, Steve filed charges with the Equal Employment Opportunity

Commission ("EEOC") claiming that Defendants terminated him because they disapproved of

his son's interracial relationship.  Steve claims that Defendants' explanation that Steve was

terminated for insubordination is merely a pretext for discrimination or, in the alternative, that

Defendants had mixed motives in their decision to terminate his employment.  (Sec. Am. Compl.

¶¶ 101-02.)  Steve also alleges that Defendants negligently violated Title VII.  (<u>Id.</u> ¶ 97.)

### B. Facts Pertinent to Ezekiel Young's Race Discrimination Claims

Plaintiff Ezekiel Young ("Ezekiel") is African American.  From October 18, 2004

through October 10, 2007, Ezekiel was an employee at the St. James.  Ezekiel was hired as a

doorman and was promoted on August 21, 2006 to the position of maintenance mechanic.

Ezekiel was occasionally asked to move items in the basement of the St. James, which was

generally a housekeeping duty.  (Sec. Am. Compl. ¶ 85; Defs.' Mem. Supp. Summ. J. Ex. 34.)

During his three years as a St. James employee, Ezekiel received two warnings.  The first

was for improperly punching out on the time clock.  (Defs.' Mem. Supp. Summ. J. Exs. 31-32.)

Management later realized that the warning was a mistake and placed a note in Ezekiel's file indicating that the problem had been resolved.  (Id.)  A second warning was issued to Ezekiel after he was allegedly seen playing Solitaire on a company computer during working hours.  (Id. at Ex. 33.)  Ezekiel denies that he was playing Solitaire.  (Sec. Am. Compl. ¶ 29.)

On August 17, 2007, Ezekiel filed charges of racial discrimination with the EEOC, claiming that: (1) African Americans were denied access to the office bathroom, parking spaces, and company-supplied bottled water; (2) only African American employees were required to punch in using the time clock; (3) he was improperly warned for failing to punch out on the time clock and for playing Solitaire on a company computer; and (4) he was discriminated against when the St. James hired Paul Kuzan as Chief Engineer.  (Id. at Ex. 37.)[4]

In his Second Amended Complaint to this Court, Ezekiel adds several new allegations. Ezekiel alleges that he was discriminated against because: (1) African American employees were denied access to company-supplied snacks; (2) African American employees were prohibited from taking breaks on the loading dock where Caucasian employees took their breaks, (3) employees were racially segregated at the 2006 company Christmas party; (4) he overheard managers claiming that they could increase profits by replacing African American employees with Caucasians; (5) African American employees were prohibited from using the office water fountain; and (6) he was demoted to housekeeping duties following a workplace injury.  (Sec. Am. Compl. ¶¶ 77-79, 81-82, 86, 92-93.)

---

[4] In the EEOC charge Ezekiel seemed to allege that Paul Kuzan was hired for the same position as Ezekiel but Kuzan was paid at a higher rate.  In the Second Amended Complaint, Ezekiel clarifies that Kuzan was hired as Chief Engineer, a better position that Ezekiel desired. (Sec. Am. Compl. ¶ 38.)

Ezekiel claims that Defendants' actions were discriminatory or, most favorably to Defendants, that Defendants had mixed motives for taking these actions.  (Id. ¶¶ 101-02.) Ezekiel also asserts that Defendants negligently violated Title VII.  (Id. ¶ 97.)

## II. Summary Judgment Standard

Summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is a "genuine" issue of material fact if the evidence would permit a reasonable jury to find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The "mere existence of a scintilla of evidence" is insufficient.  Id. at 252.

The moving party must make an initial showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The non-movant must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Instead, "'the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'"  Id. at 587 (quoting Fed. R. Civ. P. 56(e)).  In determining whether the nonmoving party has established each element of its case, the court must draw all reasonable inferences in the nonmoving party's favor.  Id.

**III. DISCUSSION**

Steve and Ezekiel allege several counts of race discrimination: violation of Title VII (Count I), violation of the Pennsylvania Human Relations Act ("PHRA") (Count II), and negligent violation of Title VII (Count III). Ezekiel also alleges race discrimination in violation of 42 U.S.C. § 1981 (Count IV).

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff may use either the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or the mixed-motive approach established in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Steve and Ezekiel also assert negligent Title VII violations. These claims are analyzed using a separate five-part framework. PHRA violations are subject to the same analysis as Title VII claims. Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995).

Under 42 U.S.C. § 1981, "all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." The elements of a § 1981 claim are identical to the elements of a Title VII employment discrimination claim. Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009).

**A. Analytical Framework**

    1. The McDonnell Douglas Burden-shifting Framework

A plaintiff asserting Title VII claims may proceed using a three step burden-shifting

-7-

framework set forth by the Supreme Court in <u>McDonnell Douglas</u>.  <u>Jones v. Sch. Dist. of Phila.</u>,

198 F.3d 403, 410 (3d Cir. 1999).  First, the <u>McDonnell Douglas</u> approach requires a plaintiff to

establish a prima facie case of discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  Under this

approach, a plaintiff must show that:

> (1) he is a member of a protected class;
> (2) he was qualified for the position he sought to attain or retain;
> (3) he suffered an adverse employment action; and
> (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.

<u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008).  Courts vary the precise components

required for a prima facie case because "the elements . . . depend on the facts of the particular

case."  <u>Jones</u>, 198 F.3d at 411.  The burden to establish a prima facie case is a not an onerous

one, but a prima facie case can allow a court "to eliminate the most obvious, lawful reasons for

the defendant's action."  <u>Pivirotto v. Innovative Sys.</u>, 191 F.3d 344, 352 (3d Cir. 1999).

    If a plaintiff successfully establishes a prima facie case, the burden shifts to the defendant

to articulate some legitimate, non-discriminatory reason for its decision.  <u>McDonnell Douglas</u>,

411 U.S. at 802.  If the defendant succeeds, the burden returns to the plaintiff to show that the

employer's stated reason for termination was merely a pretext for intentional discrimination.  <u>Id.</u>

at 804.  To survive a motion for summary judgment, a nonmoving plaintiff must point to

evidence which: 1) "casts sufficient doubt upon each of the legitimate reasons proffered by the

defendant so that a factfinder could reasonable conclude that each reason was a fabrication;" or

2) allows the factfinder to reasonably conclude that "discrimination was more likely than not a

motivating or determinative cause of the adverse employment action."  <u>Fuentes v. Perksie</u>, 32

F.3d 759, 762 (3d Cir. 1994).  The ultimate burden of persuasion remains with the plaintiff at all

times.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

2. The Price Waterhouse Mixed-motive Approach

A plaintiff claiming Title VII violations may also proceed using the mixed-motive

approach, as defined by the Supreme Court in Price Waterhouse.  In Title VII cases, the mixed-

motive approach applies when a plaintiff contends that an adverse employment decision was

made for both legitimate and discriminatory reasons.  Makky, 541 F.3d at 213.  The Third Circuit

has noted:

> The McDonnell Douglas burden-shifting framework does not apply in a mixed-
> motive case in the way it does in a pretext case because the issue in a mixed-
> motive case is not whether discrimination played the dispositive role but merely
> whether it played "a motivating part" in an employment decision.

Id. at 214.  See also 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established

when the complaining party demonstrates that race . . . was a motivating factor for any

employment practice, even though other factors also motivated the practice.").[5]  To succeed on a

Title VII claim using a mixed-motive approach, "a plaintiff need only present sufficient evidence

for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion,

sex, or national origin was a motivating factor for any employment practice."  Desert Palace, Inc.

---

[5] Under Title VII, after a mixed-motive plaintiff establishes an unlawful employment
practice, the employer may avail itself of an affirmative defense if it can "demonstrat[e] that [it]
would have taken the same action in the absence of the impermissible motivating factor."  Desert
Palace, Inc. v. Costa, 539 U.S. 90, 95 (2003) (quoting 42 U.S.C. § 2000e-5(g)(2)(B)).  This
defense limits the plaintiff's remedies, but fails to completely eliminate liability.  42 U.S.C. §
2000e-5(g)(2)(B) (the court "shall not award damages or issue an order requiring any admission,
reinstatement, hiring, promotion, or payment").  Similarly, under § 1981, "if the plaintiff shows
'by direct evidence that an illegitimate criterion was a substantial factor in the [employment]
decision,' the burden shifts to the defendant 'to convince the trier of fact that it is more likely
than not that the decision would have been the same absent consideration of the illegitimate
factor.'"  J. Kaz, Inc., 581 F.3d at 182 (quoting Price Waterhouse, 490 U.S. at 276 (O'Connor, J.,
concurring)).

v. Costa, 539 U.S. 90, 101 (2003) (internal citations and quotation marks omitted).[6]  The Title

VII mixed-motive formulation anticipates that there may be both a legitimate and prohibited

reason for the defendant's action.  Thus, a defendant cannot avoid liability simply by pointing to

a legitimate reason for the adverse employment action.

### 3. Title VII Hostile Work Environment Framework[7]

A plaintiff may also prove that an employer violated Title VII by showing that the

employer's actions created a hostile work environment.  Huston v. Procter & Gamble Paper

Prods., 568 F.3d 100, 104 (3d Cir. 2009).  To establish a hostile work environment claim, a

plaintiff must establish that: (1) he suffered intentional discrimination because of his race; (2) the

discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the

discrimination would detrimentally affect a reasonable person of the same race; and (5) there is a

basis for employer liability.  See Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007); Jensen v.

Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled on other grounds, Burlington N. & Santa Fe

Ry. Co. v. White, 548 U.S. 53 (2006).

---

[6] Courts have split on whether a mixed-motive plaintiff must satisfy each of the elements of the McDonnell Douglas prima facie case, and the Third Circuit has declined to decide the issue.  See Makky, 541 F.3d at 215; White v. Baxter Healthcare Corp., 533 F.3d 381 (6th Cir. 2008).

[7] Count III alleges a "negligent violation of Title VII" for "failure to take reasonable actions to prevent illegal discrimination."  (Sec. Am. Compl. ¶ 107.)  Courts that have allowed claims of negligence to proceed under Title VII have analyzed them under the fifth prong of the hostile work environment framework, finding that negligence may be an appropriate basis for employer liability.  See Lentz v. Gnadden Huetten Mem'l Hosp., No. 04-3147, 2004 WL 2514898, at *2 (E.D. Pa. Nov. 8, 2004).  See also King v. Lehigh Univ., No. 06-4385, 2007 WL 211278, at *2 (E.D. Pa. Jan. 23, 2007) (collecting cases).  As both plaintiffs' claims fail under this analysis, I do not decide today whether an independent cause of action for negligent violation of Title VII is viable.

**B. Steve Young's Title VII and PHRA Claims**

Steve claims that he was terminated because Defendants objected to the presence of his

African American son together with his Caucasian girlfriend at the St. James.  (Defs.' Mem.

Supp. Summ. J. Ex. 27.)[8]  He alleges that Defendants' stated reasons for terminating his lease

and employment are merely a pretext for racial discrimination.  Alternatively, Steve claims that

his lease and employment were terminated for both legitimate and discriminatory reasons.

Finally, Steve asserts that Defendants negligently violated Title VII by creating a hostile work

environment.

      1. Steve Young Satisfies his Burden Under the <u>McDonnell Douglas</u> Pretext
      Analysis

Because Steve has shown circumstances from which a reasonable jury could infer that

race was a motivating factor, he satisfies the <u>McDonnell Douglas</u> test.[9]

---

[8] The Second Amended Complaint includes additional allegations credited to Steve but they do not appear to be incorporated into Steve's Title VII claims.  In the Second Amended Complaint, Steve alleges that Defendants (1) required only African American employees to punch in and out of work using the time clock; (2) failed to promote him to the position of Chief Engineer despite his qualifications, and instead hired a Caucasian employee; (3) prohibited African American employees from using the restroom at work; (4) revoked parking spaces from him and five other African American employees; (5) forbid African American employees from consuming company-supplied bottled water and snacks; (6) prohibited African American employees from taking breaks on the building's loading dock, where Caucasian employees took their breaks; and (7) segregated African American employees from Caucasian employees at the 2006 company Christmas party.  (Sec. Am. Compl. ¶¶ 17, 38, 42-43, 45, 50, 76-79, 81-82.)  None of these allegations were included in his EEOC charge.  (Defs.' Mem. Supp. Summ. J. Ex. 27.)  Steve has not submitted testimony or other evidence to support any of these allegations.  Furthermore, his Brief does not use any of these allegations when addressing his Title VII claim.  (<u>See</u> Pls.' Mem. Opp. Summ. J. 6-12.)  Accordingly, I address the only theory of the case presented: that Steve was terminated because of his managers' disapproval of Steve's son's interracial relationship.

[9] I need not consider Steve's alternate theory that the Defendants had mixed motives because I find there is sufficient evidence to create a triable issue of fact regarding whether

Steve must fulfill the initial step of the McDonnell Douglas test by establishing a prima facie case of race discrimination. The first three elements of Steve's prima facie case are not in dispute. He is African American and a member of a class protected from race discrimination by Title VII. He is qualified for the position of maintenance technician from which he was discharged. He suffered adverse employment actions when the St. James stopped providing him with a rent-free apartment, and again when the St. James fired him.

Only the fourth element of Steve's prima facie case is disputed by Defendants.[10] Defendants argue that Steve "has not presented, and cannot present, any evidence of a nonmember of the protected class being treated more favorably than him by the St. James under those circumstances which were present at the time of his lease termination nor at the time of his subsequent termination of employment." (Defs.' Mem. Supp. Summ. J. 15.) The law, however, does not require a plaintiff to make such a showing. Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997) ("[F]avorable treatment outside the protected class . . . by no means must be present."). A plaintiff need only show that the adverse employment actions occurred under circumstances that give rise to an inference of unlawful discrimination. Pivirotto, 191 F.3d at 357.

On August 24, 2007, Steve filed a charge with the EEOC, claiming that Defendants terminated his employment because they objected to the presence of his son and his son's

---

Steve's race was a motivating factor in his termination under McDonnell Douglas.

[10] Defendants do not dispute that the termination of Steve's rent-free lease constituted an adverse employment action. The monthly value of the unit was approximately $2,000 a month. (Sablosky Dep. 55:8-9.) Demotions or significant compensation reductions can constitute adverse employment actions under Title VII. See Jones, 198 F.3d at 412.

Caucasian girlfriend in the building's public areas.  (Defs.' Mem. Supp. Summ. J. Ex. 27.)  In the

charge, Steve claimed that Walker told him in January 2007 that  "it didn't look right" for Steve's

son and his son's girlfriend to be"hugging and holding hands" in the St. James lobby.  (Id.)  When

Steve asked Walker what he meant, Walker answered: "You know what I mean."  (Id.)  Later that

month, Steve had a similar exchange with Casnoff, where he was again told that "it didn't look

right."  (Id.)  On February 1, 2007, Sablosky sent Steve a letter notifying him that his lease would

be terminated at the end of the term.  Two weeks later, Sablosky initiated a third conversation

with Steve about Steve's son and his son's girlfriend.  (Id.)  Sablosky informed Steve that if his

son and his son's girlfriend "ever got in an argument and the police were called, the police would

take her side."  (Id.)  Steve believes that all three comments reflected Defendants' disapproval of

his African American son being seen with a Caucasian female in the St. James.  (Sec. Am. Compl.

¶ 62.)  On May 1, 2007, Sablosky sent Steve a letter notifying him that his employment at the St.

James was terminated.  Steve believes that he was terminated because Defendants disapproved of

his son's interracial relationship.

The fact that three managers complained to Steve about his son's interracial relationship

suggests that the relationship was a significant point of concern for Defendants.  A reasonable jury

could infer that this concern led to Defendants' decision to terminate Steve's lease and, later,

Steve's employment.  This is especially so because of the proximity between the exchanges and

Defendants' decision to terminate Steve's lease.  Thus, Steve has established that he was

terminated under circumstances that could give rise to an inference of discrimination.

It is not self-evident, however, that legally these circumstances state discrimination against

Steve because of *his* race.  This is a case of first impression on a narrow question: whether, under

Title VII, discriminating against an individual for his child's interracial relationship constitutes

racial discrimination "because of such individual's race." 42 U.S.C. § 2000e-2(a). The Third

Circuit has not ruled on whether discriminating against a person because of an interracial

relationship constitutes race discrimination under Title VII. The Courts of Appeals that have

decided the issue have found that it does. Holcomb v. Iona College, 521 F.3d 130 (2d Cir. 2008);

Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc., 173 F.3d 988, 994 (6th

Cir. 1999); Defenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581, 589 (5th Cir. 1998),

reinstated in relevant part on reh'g en banc, Williams v. Wal-Mart Stores, Inc., 182 F.3d 333 (5th

Cir. 1999) (per curiam); Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 892 (11th

Cir. 1986).

Federal courts have previously found the interracial association doctrine to include

plaintiffs' romantic relationships, e.g., Parr, 791 F.2d 888, and at least one court has found the

doctrine to include a parent-child relationship. Tetro, 173 F.3d 988. Steve's claim asks that the

association doctrine be applied to a combination of these relationships. Given the trend of courts

to find discrimination can be based on the individual's interracial association to state a Title VII

claim, this may be a reasonable application of the doctrine. Steve's claim is logically consistent

with the principles of Title VII in that if he were Caucasian, his son would be Caucasian, and his

employers would not have had an issue with the son's relationship. That is, the Defendants

discriminated against Steve because of his race, "even though the root animus for the

discrimination is a prejudice against" a third party. Id. at 944.

The present Defendants do not dispute this issue and so I find it is unnecessary for me to

further address whether discrimination against someone for his child's interracial relationship

constitutes, as a matter of law, racial discrimination against the individual under Title VII.  That Steve's particular racial discrimination claim relies on a more indirect association is a fact that a jury can weigh when considering whether to find that race was actually a motivating cause of Defendants' actions.

In the second step of the <u>McDonnell Douglas</u> test, the burden shifts to Defendants to provide a "legitimate, nondiscriminatory reason" for termination.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  Defendants have done so.  Defendants state that Steve's lease was terminated because of the high demand for one-bedroom apartments and because the St. James no longer needed on-site maintenance workers.  (Sablosky Dep. 40:11-21, 46:6-10, 55:2-10; Hughes Dep. 11:12-17.) Defendants explain that they terminated Steve's employment because he refused to vacate the apartment and for "insubordination, including refusal to perform assigned duties or refusal to perform work in the manner described by a supervisor or manager."  (Defs.' Mem. Supp. Summ. J. Ex. 25.)  Defendants have offered evidence demonstrating that Steve engaged in other insubordinate acts during his employment at the St. James.  (<u>See</u> <u>id.</u> at Ex. 10 (warning Steve about his improper use of his work cell phone); <u>id.</u> at Ex. 12 (notifying Steve that he had violated the St. James code of conduct by: (1) refusing to move his second vehicle from the garage in a timely fashion; (2) spending time in his apartment during work hours; (3) intimidating another employee; and (4) using abusive and loud language in the main lobby); <u>id.</u> at Ex. 14 (warning Steve about his personal appearance, improper use of the time clock, and billing overtime hours without authorization); <u>id.</u> at Ex. 17 (notifying Steve that he had violated the St. James code of conduct by failing to install a lock on the door to the switchgear room, thereby creating a safety hazard).)

In step three of the <u>McDonnell Douglas</u> analysis, the burden returns to Steve to show that the defendant's "stated reason for [the adverse employment action] was in fact pretext." <u>McDonnell Douglas</u>, 411 U.S. at 804.  Steve shows that Defendants' reasons are pretext under the first method identified in <u>Fuentes</u>.[11]  Steve has produced "sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating cause of the adverse employment decision."  <u>Fuentes</u>, 32 F.3d at 765.  In Steve's declaration, he describes circumstances from which a reasonably jury could conclude that race was a motivating cause of his lease and employment termination.  A factfinder must first believe that some or all of the comments were made.  The EEOC charge declared to by Steve describing the conversations is sufficient evidence for this motion.[12]  (Defs.' Mem. Supp. Summ. J. Ex. 27.) Next, a factfinder would have to agree with Steve's interpretation that the managers' disapproval

---

[11] Steve could also show Defendants' reasons are pretext under the second method described in <u>Fuentes</u> and commonly used by pretext plaintiffs: by showing that Defendants' "proffered reasons are weak, incoherent, implausible, or so inconsistent that 'a reasonable factfinder could rationally find them unworthy of credence.'"  <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 800 (3d Cir. 2003) (quoting <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108-09 (3d Cir. 1997)).  Steve argues that it is suspicious that Defendants terminated his lease while he was still employed by the St. James.  (Pls.' Resp. Mot. Summ. J. 6.)  Counsel's precise argument is unclear.  Read generously, Steve may be suggesting that revoking a rent-free apartment was a drastic change to Steve's compensation.  If the lease termination was, as Defendants assert, not intended to personally discipline Steve then it logically would have been coupled with a pay raise to offset the significant pay cut.

[12] Plaintiffs have not submitted any evidence in support of their opposition to summary judgment.  All evidence that is construed in this opinion to support the Plaintiffs is taken from testimony and exhibits submitted by the Defendants.  Plaintiffs failure to submit evidence may be due to the fact that Plaintiffs were temporarily proceeding pro se when Defendants filed this motion.  (ECF. No. 52-58.)  All of Plaintiffs' pleadings and briefs, however, have been submitted by counsel throughout litigation.  Plaintiffs' counsel did not request an extension of time, file a motion under Fed. R. Civ. P. 56(f), or otherwise attempt to submit evidence to the Court in the many months since this motion was filed.

related to the races of the couple.  Defendants argue that the comments could relate to disapproval

of displays of affection generally in the building lobby.  However, there is no evidence in the

record that intraracial displays of affection was met with similar concern from management.  The

meaning of statements such as "it didn't look right" is ambiguous and is a matter that must be left

to a jury to determine.  Finally, a factfinder would have to infer that there was a causal nexus

between the speakers' disapproval of Steve's son's interracial relationship and the St. James's

decision to terminate Steve's lease.  That the comments were made by management personnel and

in close temporal proximity to the termination of Steve's lease supports such an inference.  See

Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks

by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given

great weight, particularly if they were made temporally remote from the date of decision.").

    2.  Steve Young Fails to Establish a Title VII Hostile Work Environment Claim

   A plaintiff alleging that his employer negligently maintained a hostile work environment

must prove that: (1) he suffered intentional discrimination because of his race; (2) the

discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the

discrimination would detrimentally affect a reasonable person of the same race; and (5) there is a

basis for employer liability.  See Andreoli, 482 F.3d at 643; Jensen, 435 F.3d at 449.

   Steve fails to show three of the five prongs of a hostile work environment.  For the reasons

discussed in the McDonnell Douglas analysis, I will assume that Steve shows the first prong of

intentional race discrimination.  Steve also meets the fifth prong of establishing a basis for

employer liability because a plaintiff can demonstrate liability by showing that supervisors created

the hostile work environment.  See Jensen, 435 F.3d at 452.  However, even if the comments were

taken to be racially offensive, three ambiguous verbal remarks to Steve about his son's girlfriend do not rise to the level of severe or pervasive racial harassment.  There is no evidence that Steve suffered "retaliatory harassment severe or pervasive enough to 'alter the conditions of [his] employment and create an abusive working environment.'"  Jensen, 435 F.3d at 451 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  Therefore, I will grant Defendants' motion for summary judgment on Count III as to Steve's claim.

### C. Ezekiel Young's Title VII, PHRA, and § 1981 Claims

Ezekiel's Title VII claims are confined to the scope of the complaints he asserted in his EEOC charge.[13]  In his charge, Ezekiel claimed that Defendants racially discriminated in his terms and conditions of employment by declaring: (1) African American employees were denied parking spaces, access to the office bathroom, and the use of bottled water; (2) Defendants only required African American employees to punch in using a time clock; and (3) Ezekiel was improperly warned (a) for failing to punch out on the time clock and (b) for playing Solitaire on the company computer.  (Defs.' Mem. Supp. Summ. J. Ex. 37.)  In his pleadings, Ezekiel elaborates on the presence of discriminatory conditions by further alleging that (1) he overheard managers saying that they could increase company profits by replacing African American employees with Caucasians (Sec. Am. Compl. ¶¶ 92-93); (2) African American employees were prohibited from using the water fountain (id. ¶¶ 54-56); (3) African American employees were denied access to company-supplied snacks (id. ¶¶ 81-82); (4) African American employees were prohibited from

---

[13] To pursue a claim under Title VII, a plaintiff must file a claim with the EEOC within 300 days of the discriminatory action.  42 U.S.C. § 2000e-5.  Ezekiel's allegations regarding a demotion to housekeeping will not be considered as a part of his Title VII claims because they are outside the scope of his EEOC charge.  (Compare Sec. Am. Compl. ¶¶ 83-89, with Defs.' Mem. Supp. Summ. J. Ex. 37.)

taking breaks on the loading dock, where Caucasian employees took breaks (id. ¶¶ 78-80); and (5) African American employees were segregated from Caucasian employees at the 2006 company Christmas party (id. ¶¶ 76-77).

Ezekiel claims Defendants discriminated by failing to promote him to Chief Engineer.  In his EEOC charge, Ezekiel claimed that he was discriminated against when Defendants hired Paul Kuzan, a Caucasian.  (Defs.' Mem. Supp. Summ. J. Ex. 37.)  In his pleadings, Ezekiel clarifies that Kuzan was hired as Chief Engineer even though Ezekiel was qualified for and applied for the position.[14]  (Sec. Am. Compl. ¶¶ 32-40.)

Ezekiel incorporates the above Title VII allegations under § 1981 and asserts a new claim.[15]  Ezekiel alleges he was demoted to the housekeeping department following a workplace injury, and Defendants replaced him with a Caucasian male.  (Id. ¶¶ 83-89.)

Ezekiel contradicts some of the above allegations and others completely lack support in evidence.  I begin by identifying which allegations will simply be disregarded.  I then analyze whether the remaining allegations establish a prima facie case of race discrimination in Ezekiel's

---

[14] To be precise, in the EEOC charge Ezekiel seemed to allege that Paul Kuzan was hired for the same position as Ezekiel but Kuzan was paid at a higher rate.  (Defs.' Mem. Supp. Summ. J. Ex. 37.)  The difference between this statement and the allegations in the pleadings transforms Ezekiel's claim from a compensation-discrimination claim to a failure-to-promote claim.  This alteration is permissible because it is due to a factual clarification that would have been discovered in an investigation of his original allegations about Kuzan to the EEOC.  See Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (explaining that Title VII exhaustion will be excused for allegations raised in court that are within the scope of EEOC complaint or would have grown from an investigation of the complaint).

[15] A plaintiff is not required to file an administrative charge before filing a § 1981 suit.  Steve's § 1981 claims are not limited to the scope of his EEOC charge.  See Johnson v. Ry. Exp. Agency, Inc., 421 U.S. 454, 460 (1975).

conditions of employment or in Defendants' failure to promote Ezekiel.

### 1. Contradicted and Unsupported Allegations

For the purpose of this motion, Ezekiel's declaration to the EEOC is sufficient evidence. Two allegations in the declaration must be disregarded, however, because of Ezekiel's contradictory admissions in testimony. First, Ezekiel declared that African American employees were denied parking spaces. Ezekiel admits, however, that he had access to a parking spot throughout his employment at the St. James. (Ezekiel Dep. 68:11-69:24, Nov. 11, 2009.) Ezekiel does not attempt to explain this direct contradiction, and there is no other evidence in the record to support finding that African American employees were denied parking spaces. Indeed, Steve also testified that he had a parking space throughout his employment and that the allegation in the Complaint about parking spaces was "incorrect." (Steve Dep. 122:13-17, Nov. 6, 2009.) Second, Ezekiel declared that African American employees were "denied use of, and a key to, the office bathroom." (Defs.' Mem. Supp. Summ. J. Ex. 37.) Ezekiel admits in testimony that the key to the restroom was available to all employees, including African Americans, at the concierge desk. (Ezekiel Dep. 57:9-18.) Defendants also provide evidence that maintenance employees such as Ezekiel were allowed to use the office bathroom. (Hughes Dep. 22:20-23:5.) Given that Ezekiel's testimony directly contradicts these two allegations, a factfinder could not reasonably rely on these portions of his EEOC declaration.

The allegations that Ezekiel adds in his Second Amended Complaint regarding discriminatory conditions must also be disregarded for the purpose of this motion because there is

no support for them in evidence.[16]  When a properly supported motion for summary judgment is

made, "an opposing party may not rely merely on allegations or denials in its own pleading."  Fed.

R. Civ. P. 56(e)(2).  I draw all reasonable inferences in Ezekiel's favor on this motion, however,

the above allegations cannot reasonably be given any weight.

      2. Ezekiel Fails to Meet his Burden Under <u>McDonnell Douglas</u> Pretext
      Analysis

Ezekiel's remaining allegations can be divided into a claim of discriminatory terms and

conditions of employment and a claim of discrimination in Defendants' failure to promote him.  I

apply the <u>McDonnell Douglas</u> framework to each of these claims.  In the first step of <u>McDonnell

Douglas</u>, Ezekiel must show a prima facie case of race discrimination.  Because Ezekiel is a

member of a protected class, he is able to establish the first element of the prima facie test and the

inquiry focuses on the other three elements.  I find that Ezekiel fails to meet his burden under

<u>McDonnell Douglas</u> because he cannot show the elements of a prima facie case for either claim.

      a. Ezekiel Does Not Establish a Prima Facie Case of Discriminatory
      Employment Conditions

Ezekiel's remaining allegations relating to discriminatory conditions of employment are

that: (1) African Americans were denied bottled water; (2) only African Americans were required

---

[16] Indeed, the only relevant evidence before the Court contradicts these new allegations.
As for his claim that African American employees were deprived of company-supplied snacks,
Ezekiel concedes that *everyone* at the St. James was prohibited from taking snacks–not just
African Americans.  (Ezekiel Dep. 60:12-23.)  With respect to the claim that African Americans
were prohibited from taking smoking breaks on the loading dock, Hughes testified that *all*
employees were prohibited from smoking on the premises and that, when she observed
employees smoking on the loading dock, she would tell them to stop.  (Hughes Dep. 23:12-25.)
With regard to segregated seating at the Christmas party, Hughes testified that there was no
assigned seating at the Christmas party except for the "property owners that were invited guests
to the party."  (<u>Id.</u> at 58:9-19.)

to use a time clock; and (3) Defendants gave him two improper warnings.  Ezekiel's claim fails to

establish the third element of a prima facie case: that he suffered an adverse employment action.[17]

Ezekiel has not established a prima facie case because the events he describes do not rise

to the level of an actionable adverse employment action.  An adverse employment action is one

"that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or

privileges of employment.'"  Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)

(quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)).  "Not everything that makes an

employee unhappy is an actionable adverse action."  Smart v. Ball State Univ., 89 F.3d 437, 441

(7th Cir. 1996).  Although "formal reprimands that result in a notation in an employee's personnel

file" can support a finding of adverse employment action,  Robinson v. City of Pittsburgh, 120

F.3d 1286, 1298 (3d Cir. 1997), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,

524 U.S. 742 (1998), this is true only if they significantly change an employee's employment

status.  Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1224 (10th Cir. 2006).

Although the denial of snacks, bottled water and parking spaces may be frustrating, these

actions are not so significant as to alter the terms of Ezekiel's employment.  See Storey, 390 F.3d

at 764.  Ezekiel's reprimands also did not affect his employment status.  The first warning did not

adversely affect him because the warning was rescinded.  On May 2, 2007, management added a

---

[17] Additionally, Ezekiel would likely be unable to show the fourth element: that these actions occurred under circumstances that could give rise to an inference of race discrimination. Defendants show that access to bottled water and the use of the time clock were determined by employment status rather than race.  Ezekiel does not explain why this is not to be believed.  See Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue.") (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

note to Ezekiel's file acknowledging that he had, in fact, punched out on the time clock correctly.

(Defs.' Mem. Supp. Summ. J. Exs. 31-32.)  The second warning was never resolved in Ezekiel's

favor.  Nonetheless, Ezekiel fails to show that this single warning in any way affected his

employment status.  See Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001) (refusing to

consider two written reprimands as adverse employment actions when the employee was "not

demoted in title, did not have his work schedule changed, was not reassigned to a different

position or location . . . , did not have his hours or work changed or altered in any way, and . . .

was not denied any pay raise or promotion").

I will grant summary judgment for Defendants on the discriminatory conditions claim

because Ezekiel has not established that he suffered an adverse employment action.

> b. Ezekiel Does Not Establish a Prima Facie Case of a
> Discriminatory Failure to Promote

Ezekiel's discriminatory promotion claim fails to show the second and third elements

required for his prima facie case under McDonnell Douglas.  To show the second element, a

plaintiff must possess the qualifications for the position he seeks to attain.  Makky, 541 F.3d at

214.  For the third element in a failure-to-promote claim, a plaintiff must show that he made

"every reasonable attempt to convey his interest in the job to the employer."  E.E.O.C. v. Metal

Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990).

Ezekiel fails to show that he was qualified for the position he sought to attain, Chief

Engineer.  The Chief Engineer position required a Philadelphia Engineer's License and HVAC

certification.  (Defs.' Mem. Supp. Summ. J. Ex. 39.)  Ezekiel's curriculum vitae shows that he did

not possess those qualifications.  (Id. at Ex. 40.)  This evidence is uncontroverted.  Ezekiel fails to

show that he suffered an adverse employment action because he has not shown that he conveyed

his interest in the Chief Engineer position to anyone.  Ezekiel admits in testimony that he did not

apply for the position of Chief Engineer (Ezekiel Dep. 116:14-19), or otherwise ask to be

considered for the position (id. at 75:19-23).

Because Ezekiel fails to establish the existence of two of the elements essential to his

failure-to-promote claim, I will grant summary judgment for Defendants on this claim as well.

### 3.  Ezekiel Fails to Satisfy his Burden Under the <u>Price Waterhouse</u> Mixed-Motive Approach

To show that a Title VII claim satisfies the mixed-motive analysis, a plaintiff must provide

"sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that

race . . . was a motivating factor" behind the defendants' employment actions.  <u>Desert Palace</u>, 539

U.S. at 101.  As under <u>McDonnell Douglas</u>, a mixed-motive plaintiff must show that he was

qualified for the position he sought to attain and that he suffered an adverse employment action.

<u>Makky</u>, 541 F.3d at 215.  For the reasons discussed above, Ezekiel fails to satisfy these

requirements and so his Title VII claims cannot proceed under a mixed-motive theory.

### 4.  Ezekiel Fails to Establish a Hostile Work Environment Claim

Ezekiel alleges that management employees at the St. James created a hostile work

environment.  Because he fails to provide any evidence of intentional race discrimination, Ezekiel

cannot establish the first four elements of the test.  I will therefore grant Defendants' motion for

summary judgment on this claim as well.

5. Ezeikiel's § 1981 Claims Also Fail

Because the elements of an employment discrimination claim brought under § 1981 are identical those under Title VII, all of the claims rejected above must be rejected under § 1981 as well. Ezekiel's only additional claim is that he was demoted to housekeeping. Ezekiel testified that he was once asked to clean and move items from the basement. (Ezekiel Dep. 98:19-22.)

A temporary reassignment does not constitute a demotion or an adverse employment action. See Alvarado v. Tex. Rangers, 492 F.3d 605, 614 (5th Cir. 2007) ("'[A] plaintiff's subjective perception that a demotion has occurred is not enough.'") (quoting Forsyth v. City of Dallas, Tex., 91 F.3d 769, 774 (5th Cir. 1996)); Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993) ("[A] materially adverse change in the terms and conditions of employment must be more disruptive than . . . an alteration of job responsibilities."); Ferguson v. E.I. duPont de Nemours & Co., Inc., 560 F. Supp. 1172, 1201 (D. Del. 1983) (holding that an employee who was temporarily transferred and who retained her pay and benefits had not suffered an adverse employment action).

Ezekiel cannot show that his assignment to housekeeping duties constitutes an adverse employment action. Although Ezekiel terms this a "demotion," he provides evidence showing only that he was assigned isolated housekeeping responsibilities.[18] He provides no evidence that Defendants permanently assigned him to a housekeeping position or decreased his wage.

---

[18] Ezekiel's testimony also reveals a different sequence of events from that alleged in his Second Amended Complaint. Although the Complaint alleges that Ezekiel was demoted to the housekeeping department after he was injured at work, (Sec. Am. Compl. ¶¶ 83-86), Ezekiel testified that he was actually assigned housekeeping duties before his injury occurred. (Ezekiel Dep. 98.) In fact, Ezekiel was injured while cleaning the basement in his capacity as a maintenance mechanic. (Id. at Ex. 34.) Ezekiel fails to explain this discrepancy.

Ezekiel's temporary assignment to housekeeping duties does not show the necessary "adverse employment action" for his claim. I will therefore grant Defendants' motion for summary judgment with respect to all of Eziekel's § 1981 claims.

## IV. CONCLUSION

I will deny Defendants' motion for summary judgment on Steve's Title VII (Count I). Because the same analysis is applicable to the PHRA claim, I will deny the motion on his state claim as well (Count II).

I will grant Defendants' motion for summary judgment on Steve's claim for "negligent violation" of Title VII (Count III). I will also grant Defendants' motion for summary judgment on all of Ezekiel's claims (Counts I, II, III, and IV).


s/Anita B. Brody


_____

ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: